**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **COMMODITY FUTURES TRADING COMMISSION,**<br><br>**Plaintiff,**<br><br>v.<br><br>**GANNON KEN VAN DYKE,**<br><br>**Defendant.** | Civil Action No. 26-cv-3369<br><br>**COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF, AND FOR CIVIL MONETARY PENALTIES UNDER THE COMMODITY EXCHANGE ACT AND COMMISSION REGULATIONS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Commodity Futures Trading Commission ("CFTC" or "Commission"), by and through its attorneys, alleges as follows:

## I.     INTRODUCTION

1.     From at least December 2025 through January 2026 (the "Relevant Period"), Defendant Gannon Ken Van Dyke ("Van Dyke") engaged in a fraudulent and deceptive scheme in connection with the purchase and sale of event contracts traded on the prediction market known as Polymarket.com.

2.     During the Relevant Period, Van Dyke was an enlisted member of the U.S. Army's Special Forces.  In that role, Van Dyke acquired sensitive nonpublic information regarding U.S. military operations to capture and arrest former Venezuelan President Nicolás Maduro ("Maduro") and Cilia Flores ("Flores"), an operation which Van Dyke helped plan and execute ("Operation Absolute Resolve").  Van Dyke had a duty and obligation to maintain the confidentiality of the information he acquired, a duty he breached by misappropriating the information and using it to trade contracts related to Maduro on Polymarket.com.  Van Dyke obtained more than $404,000 in illicit profits through his scheme.

1

3.    By this conduct and further conduct described herein, Van Dyke violated Sections 4c(a)(3), 4c(a)(4)(C), and 6(c)(1) of the Commodity Exchange (the "Act"), 7 U.S.C. §§ 6c(a)(3), 6c(a)(4)(C), 9(1), and Commission Regulation 180.1(a)(1), (3), 17 C.F.R. § 180.1(a)(1), (3) (2025).

4.    Unless restrained and enjoined by this Court, Van Dyke will likely continue to engage in acts and practices alleged in this Complaint and similar acts and practices, as described below.

5.    The CFTC brings this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, to enjoin Van Dyke's unlawful acts and practices and to compel his compliance with the Act and the Regulations promulgated thereunder.    The CFTC also seeks civil monetary penalties, disgorgement of profits obtained through the scheme at issue, restitution, trading and registration prohibitions, and any other such equitable and ancillary relief as the Court deems necessary or appropriate.

## II.    JURISDICTION AND VENUE

6.    The Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331 (codifying federal question jurisdiction) and 28 U.S.C. § 1345 (providing that district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress).  In addition, Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a), authorizes the CFTC to seek injunctive and other relief against any person whenever it shall appear to the CFTC that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act, or any rule, regulation, or order thereunder, and provides that U.S. district courts "shall have jurisdiction to entertain such actions."

7.      Venue lies properly with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e), because certain transactions, acts, practices, and courses of business alleged in this Complaint occurred, are occurring, or are about to occur in this District.

### III.    THE PARTIES

8.      Plaintiff **Commodity Futures Trading Commission** is an independent federal regulatory agency charged by Congress with the administration and enforcement of the Act and the Regulations promulgated thereunder.

9.      Defendant **Gannon Ken Van Dyke** is an individual who resides in Fayetteville, North Carolina.  Van Dyke has been an active-duty service member in the U.S. Army's Special Forces since September 2008.  From approximately October 2023 to the present, Van Dyke was a Master Sergeant.  During the Relevant Period, Van Dyke was assigned to, employed by, or associated with the U.S. Army Special Operations Command ("USASOC"), and was based at Fort Bragg Military Base in Fayetteville, NC.  Van Dyke has never been registered with the CFTC in any capacity.

### IV.    RELEVANT NON-PARTIES

10.     **Polymarket** is a financial services company that, among other things, facilitates the trading of event contracts through a decentralized-finance ("DeFi") trading protocol operating on the Polygon blockchain ("Polymarket.com").  Polymarket.com lists event contracts for trading on the DeFi protocol on its website, www.polymarket.com.

11.     The Polygon blockchain is maintained by Polygon Labs.  Users access the Polygon blockchain through nodes that contain a copy of the blockchain.

12.     Polymarket.com is operated by Blockratize, Inc. ("Blockratize"), a Delaware corporation that does business under the name Polymarket, and Adventure One QSS Inc.

("Adventure One"), a Panamanian corporation.  Polymarket's corporate headquarters is in New York, New York.

13.    Polymarket's "Markets Team" manages the creation and deployment of contracts that are listed on Polymarket.com.  During the Relevant Period, a majority of the Markets Team worked in its New York headquarters.  This included Polymarket's Head of Markets and one of its two Markets Leads.

14.    For a subset of contracts based on routine or predicable events (such as regularly scheduled sports games or contracts related to the price of bitcoin during a specified time period), Polymarket.com uses software to automatically deploy the contracts.  For all other contracts, the Markets Team determines which contracts to list for trading on Polymarket.com, creates and deploys those contracts through a portal developed in New York, New York, and drafts the rules for contracts.  The Markets Team also manages the operation of Polymarket.com's liquidity rewards program.

15.    Some employees on Polymarket.com's "Platform Team" are also based in New York, New York.  The Platform Team is responsible for supporting the infrastructure traders use to execute peer-to-peer transactions on Polymarket.com.

## V.    STATUTORY BACKGROUND AND LEGAL FRAMEWORK

### A.    The Commodity Exchange Act

16.    The purpose of the Act is to "serve the public interests . . . through a system of effective self-regulation of trading facilities, clearing systems, market participants and market professionals under the oversight of the Commission," as well as "to deter and prevent price manipulation or any other disruptions to market integrity; to ensure the financial integrity of all transactions subject to [the] Act and the avoidance of systemic risk; to protect all market participants from fraudulent or other abusive sales practices and misuses of customer assets; and

4

to promote responsible innovation and fair competition among boards of trade, other markets and market participants." Section 3 of the Act, 7 U.S.C. § 5. The Act confers on the CFTC "exclusive jurisdiction" to regulate various categories of derivatives markets, including swaps. 7 U.S.C. § 2(a)(1)(A).

**B.      Section 4c(a)(3)-(4) of the Commodity Exchange Act**

17.    The Act also seeks to deter and prevent the misuse of nonpublic government information to trade in commodities and derivatives markets for personal gain. Toward that end, the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 expanded the Act's prohibitions on insider trading to apply not only to the misuse of information by CFTC personnel, self-regulatory organizations, and exchanges, but also to the misuse of nonpublic government information by any person. In seeking and implementing those amendments, codified in Section 4c(a)(3)-(4) of the Act, Congress affirmed its intent to ban government employees and agents from insider trading using nonpublic government information, and all persons from insider trading using nonpublic information misappropriated from a government source.

**C.      Section 6(c)(1) of the Commodity Exchange Act and CFTC Regulation 180.1(a)**

18.    Section 6c(1) of the Act, 7 U.S.C. § 9(1), in relevant part, makes it unlawful for any person, directly or indirectly, to:

> use or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate . . .

19.    CFTC Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2025), promulgated pursuant to the authority in Section 6(c)(1) of the Act (which was enacted under the Dodd-Frank Act), makes it unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale

of any commodity in interstate commerce, or contract for future delivery on or subject to the rules

of any registered entity, to intentionally or recklessly:

> (1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud; . . . or

> (3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person.

## VI.    FACTS

### A.    Prediction Markets

20.    On prediction markets, participants buy and sell event contracts, which are derivative instruments that enable parties to trade on their predictions about whether or to what extent a future event—which may relate to economics, elections, climate, sports, or anything else of potential financial, economic, or commercial consequence—will occur.  Event contracts often have a binary payoff, where the winning side of the contract receives a fixed amount, and the losing side of the contract receives nothing.

21.    Polymarket.com uses the UMA Oracle to determine the resolution of the event contracts it lists for trading on its DeFi protocol, which operates as a prediction market.  UMA is a so-called decentralized oracle.  Anyone can propose a resolution of a Polymarket.com event contract by selecting a winning outcome, posting a bond, and submitting that proposal to the UMA Oracle.  After a proposal is made, there is generally a two-hour challenge period where anyone can dispute the proposed outcome by posting a counter-bond.  If there is a dispute, there is a 24 to 48-hour debate period, during which evidence can be submitted in UMA's Discord channels.  After the debate period—or if there is no debate period, after two hours—UMA token holders vote on the correct outcome.  If one of the proposed resolutions is accepted, trading on the event contract stops, and holders of winning positions are entitled to redeem their shares for 1 USDC.e per share.

USDC is a stablecoin, the value of which is pegged 1:1 to the U.S. dollar.  USDC.e is a version of USDC that has been "bridged" from Ethereum to another blockchain ecosystem such as Polygon.

22.    For example, if Polymarket.com creates a contract based on whether the Federal Reserve's Federal Open Market Committee ("FOMC") will lower interest rates at one of its regularly scheduled meetings, a person holding a "Yes" share in that contract receives 1 USDC.e for each share they hold if the FOMC lowers interest rates, while a person holding a "No" share receives 1 USDC.e for each share they hold if the FOMC does not.  A person holding shares in the losing side of the contract receives nothing.

23.    While Polymarket.com may list multiple dates or criteria for occurrences related to the same event, each of those dates or criteria is listed as a separate event contract.  Using the previous example, if Polymarket.com creates contracts based on whether the FOMC will keep interest rates the same, lower interest rates by 25 basis points, or lower them by 50 basis points or more, it will create three separate Yes/No contracts for each threshold.  As another example, if Polymarket.com creates contracts based on whether a specified event will occur by December 31, January 31, or February 28, it will create three separate Yes/No contracts, one for each of those dates.

24.    Polymarket.com lists the price of a contract as a percentage, with the price of the contract equal to one cent for each percentage point.  For example, if Polymarket.com shows the price of a "Yes" share of a contract as 25%, that means buying one "Yes" share costs $0.25.

25.    The trading of event contracts, which is influenced by, among other things, real-time information, determines the value of an event contract.  Between the time an event contract is listed and the time the contract is resolved, its price can fluctuate based on traders' perception

of whether the event will occur or not.  Information indicating that an event is likely or certain to occur is information that affects or tends to affect the price of an event contract.

26.    Event contracts are a type of "swap" as defined by the Act.  Section 1a(47)(A) of the Act broadly defines "swap" to include "any agreement, contract, or transaction"—

> (i) that is a put, call, cap, floor, collar, or similar option of any kind that is for the purchase or sale, or based on the value, of 1 or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind;

> (ii) that provides for any purchase, sale, payment, or delivery . . . that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence; . . .

> (iv) that is an agreement, contract, or transaction that is, or in the future becomes, commonly known to the trade as a swap . . . [or,]

> (vi) that is any combination or permutation of, or option on, any agreement, contract, or transaction described in any of [these clauses].

27.    Event contracts are swaps because they are settled based on the occurrence or non-occurrence of a specified future event with potential financial, economic, or commercial consequences, such as the occurrence of a weather event, the outcome of an election, the price of a market index, or prevailing interest rates.

**B.    The "Maduro Out" Contracts**

28.    On or around December 31, 2024, Polymarket.com listed an event contract titled "Maduro Out by 2025?" (the "December Contract") on its DeFi protocol.  According to Polymarket.com's rules for the contract, it would resolve to "Yes" if Maduro was removed from power for any length of time between January 1, 2025 and the end of the day on December 31, 2025.

29.    On December 11, 2025, Polymarket.com listed an additional Maduro Out contract on its DeFi protocol dated January 31, 2026 (the "January Contract").  The January Contract would

resolve to "Yes" if Maduro was removed from power for any length of time between December 11, 2025 and the end of the day on January 31, 2026.

30. The December and January Contracts are swaps because they are agreements, contracts, or transactions providing for a purchase, sale, payment, or delivery dependent on the occurrence or nonoccurrence of an event or contingency, *i.e.*, Maduro's removal from power, associated with a potential financial, economic, or commercial consequence. The potential financial, economic, or commercial consequences of Maduro's removal from power were substantial, including but not limited to potential impacts on the global prices of crude oil, Venezuelan government bonds, and the Venezuelan bolívar. The December and January Contracts were traded using interstate commerce, including by persons located in the United States and persons who funded their accounts using U.S.-based financial institutions.

31. The price of a "Yes" share in the January Contract was low for most of the time it was listed. Based on blockchain data, the price of a "Yes" share remained below $0.30 from the time the January Contract was listed until at least 11:00 PM ET on January 2, 2026. In late December and early January, the price of a "Yes" share trended lower, remaining below $0.13 from 10:00 AM ET on December 29, 2025 through 1:15 AM ET on January 3, 2026, other than a momentary spike to approximately $0.22 at or around 10:42 PM ET on January 2, 2026.

**C.      The Arrest of Nicolás Maduro**

32. In the early morning hours of January 3, 2026, U.S. special forces and law enforcement agents captured Maduro and Flores and transported them to the United States for prosecution on drug trafficking conspiracy charges. President Trump announced Maduro's capture via a post on TruthSocial at or around 4:21 AM ET on January 3, 2026. Prior to President Trump's announcement, information about Operation Absolute Resolve was unavailable to the

general public and had not been disseminated by any government department or agency in a manner that made it generally available to the trading public.

33.    The price of a "Yes" share in the January Contract spiked rapidly after President Trump's social media post announcing Maduro's capture, rising from $0.375 at 4:21 AM ET to $0.955 at 4:25 AM ET.  The price of a "Yes" share remained above $0.95 from 4:25 AM ET on January 3, 2026 until the January Contract resolved to "Yes" at or around 7:14 AM ET on January 3, 2026.

**D.    Van Dyke's Knowledge of Operation Absolute Resolve**

34.    During the Relevant Period, Van Dyke was involved in the planning and execution of Operation Absolute Resolve.

35.    On or about December 8, 2025, as part of his assignment with USASOC Western Hemisphere Operations, Van Dyke received a "Classified Information Security Briefing" and executed a nondisclosure agreement (the "NDA") providing that he would "never divulge, publish, or reveal by writing, word, conduct, or otherwise, to any unauthorized person, any classified or sensitive information" relating to USASOC operations within the Western Hemisphere, and stating that any such information was "the property of the Government of the United States of America."

36.    As a result of his involvement with Operation Absolute Resolve, and prior to any trading he did on Polymarket.com, Van Dyke acquired and was privy to nonpublic classified or sensitive information about Operation Absolute Resolve ("Nonpublic Government Information" or "NGI").

37.    Van Dyke acquired the NGI by virtue of his employment or position as a member of the U.S. Army's Special Forces.  At the time that he acquired the NGI, Van Dyke knew that it was not generally available to the public and had not been disseminated by any government department or agency in a manner which made it generally available to the public.

38.    Notably, in or around November 2025, Van Dyke had uploaded to his Google account a screenshot displaying the results of an artificial intelligence query.  The results stated that the U.S. Special Forces have "numerous classified files, records, and operational details that are not available to the public."  The results went on to state that "[e]ven when some information is released for political or historical reasons, many sensitive details, such as specific sources, methods, and full operational timelines, are consistently withheld to protect national security interests and future operations."

39.    The NGI was information that would affect or tend to affect the price of a swap, namely event contracts related to Maduro and Venezuela, and thus material as to those contracts.

**E.    Van Dyke's Duty of Trust and Confidentiality**

40.    Van Dyke owed a duty of trust and confidentiality to the U.S. Government— including the Department of War and the U.S. Army—and its citizens to maintain the confidentiality of the NGI.

41.    As noted above, on or around December 8, 2025, Van Dyke signed the NDA, which obligated him to maintain the confidentiality of any classified or sensitive information he acquired by virtue of his assignment, employment, or association with USASOC, and stated that any such information was "the property of the Government of the United States of America."

42.    The NDA incorporated the government's Standard Form 312 ("SF312"), which is titled "Classified Information Nondisclosure Agreement."  Standard Form 312 obligates the signer to maintain the confidentiality of any classified or sensitive information they obtain, and states that the signer understands and accepts "that by being granted access to classified information, special confidence and trust shall be placed in me by the United States Government."

43.    In addition, Department of War Policies and Ethical Regulations provide that Van Dyke had a responsibility to the United States Government and its citizens to place loyalty to the

Constitution, laws, and ethical principles above private gain. Those policies and regulations also prohibited Van Dyke from engaging in financial transactions using nonpublic information and from using nonpublic information to further his own private interests.

44.    Furthermore, Sections 4c(a)(3), 4c(a)(4)(C), and 6(c)(1) of the Act, 7 U.S.C. §§ 6c(a)(3), 6c(a)(4)(C), and 9(1), and Commission Regulation 180.1(a)(1), (3), 17 C.F.R. § 180.1(a)(1), (3) (2025), prohibited Van Dyke from using the NGI to enter into a swap.

### F.    Van Dyke's Trading

45.    Notwithstanding his duties of trust and confidentiality, Van Dyke illicitly used the NGI to trade event contracts related to Maduro's removal from power.

46.    Van Dyke opened an account at a U.S.-based cryptocurrency exchange (the "Exchange") on or around June 11, 2017. Van Dyke did not engage in any activity in his Exchange account from at least January 1, 2025 through December 25, 2025. On or around December 26, 2025, Van Dyke funded his account at the Exchange via a transfer of approximately $35,000 from his personal bank account.

47.    On or around December 24, 2025, Van Dyke submitted an application to open an account at a CFTC-licensed and regulated designated contract market, not affiliated with Polymarket, which allows U.S.-based users to trade event contracts (the "DCM"). At the time, the DCM offered event contracts related to Venezuela, including event contracts related to the removal of Maduro. Van Dyke was unable to open his account at the DCM, despite contacting the DCM's customer support chat on or around December 26, 27, and 28, 2025.

48.    On or around December 26, 2025, Van Dyke created an account at Polymarket.com that he operated in his personal capacity. During the Relevant Period, Van Dyke's Polymarket.com profile used the wallet address 0x31a5********************************8ed9 and the handle "Burdensome-Mix," among other handles.

12

49.     In a set of four transactions between December 30, 2025 and January 2, 2026, Van Dyke sent digital assets from his Exchange account to deposit wallet addresses associated with Polymarket.com. Van Dyke then converted his digital assets to USDC.e and transferred them to his Polymarket.com profile.

50.     After converting his digital assets to USDC.e, Van Dyke began purchasing "Yes" shares in the January Contract. He purchased approximately 14,600 shares across two transactions on the evening of December 30, 2025; 73,700 shares on the evening of January 1, 2026; approximately 90,300 shares the morning of January 2, 2026; and more than 250,000 shares across three separate transactions between 8:30 and 10:00 PM ET on January 2, 2026. Van Dyke's trades executed against multiple counterparties who used wallet addresses that received assets from, or sent assets to, U.S. persons.

51.     At the time Van Dyke purchased "Yes" shares in the January Contract, Operation Absolute Resolve had not been publicly announced, and the U.S. government had not disclosed the NGI to the trading public or general public.

52.     In aggregate, Van Dyke accumulated more than 436,000 "Yes" shares of the January Contract at an average price of approximately $0.074 for a total cost of approximately $32,538.

53.     When the January Contract resolved to "Yes" following the first public announcement of Maduro's capture, Van Dyke received more than approximately 436,000 USDC.e, realizing more than $404,000 of profits on the January Contract.

54.     Van Dyke used the NGI in his personal capacity and for his personal gain when buying shares in the January Contract. By doing so, Van Dyke breached his duty to maintain the

confidentiality of the NGI, and by breaching that duty, Van Dyke stole, converted, or misappropriated the NGI.

55.    In addition to his trading in the January Contract, Van Dyke also bought "Yes" shares in three other contracts related to Venezuela listed on Polymarket.com:  "Trump Invokes War Powers Against Venezuela by January 31, 2026?," "Will the U.S. Invade Venezuela by January 31, 2026?," and "US forces in Venezuela by January 31, 2026?" (collectively with the January Contract, the "Venezuela Contracts").  Van Dyke generated profits of more than $5,000 through his trading on these three contracts.

56.    Van Dyke held his "Yes" shares in the "US forces in Venezuela" contract until it resolved to "Yes."  The "Will the U.S. Invade Venezuela by January 31, 2026?" contract ultimately resolved to "No," but despite initially purchasing "Yes" shares, Van Dyke profited by selling his "Yes" position in that contract on January 3, 2026 prior to its resolution.  Even though it ultimately resolved to "Yes," Van Dyke also sold his "Yes" shares in the "War Powers" contract at a profit on January 3, 2026.

57.    Van    Dyke    did    not    use    his    0x31a5********************
***********8ed9 wallet address to engage in any other trading on Polymarket.com.

58.    On January 3 and 4, 2026, Van Dyke transferred his winnings on the Venezuela Contracts to his Exchange account.

59.    On January 15, 2026, Van Dyke exchanged the USDC he received from trading the Venezuela Contracts during the Relevant Period for fiat U.S. dollars totaling $444,209.  He transferred those funds from the Exchange to his personal bank account at a U.S. financial institution with its headquarters in Texas the same day.

## VII.   VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND COMMISSION REGULATIONS

### COUNT ONE

### Violations of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1(a)(1), (3), 17 C.F.R. § 180.1(a)(1), (3) (2025)

60.     The allegations in the preceding paragraphs are realleged and incorporated herein by reference.

61.     The January Contract is a swap as defined by Section 1a(47) of the Act, 7 U.S.C. § 1a(47).

62.     Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), makes it unlawful for any person, directly or indirectly, to:

> [U]se or employ, or attempt to use or employ, in connection with any swap . . . any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate by not later than 1 year after [July 21, 2010, the date of enactment of the Dodd-Frank Wall Street Reform and Consumer Protection Act].

63.     Regulation 180.1(a)(1), (3), 17 C.F.R. § 180.1(a)(1), (3) (2025), provides, in part:

> It shall be unlawful for any person, directly or indirectly, in connection with any swap . . . to intentionally or recklessly: (1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud; . . . [or] (3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person . . . .

64.     During the Relevant Period, Van Dyke acquired NGI regarding Operation Absolute Resolve that was material to the price of the January Contract.

65.     Any reasonable market participant would have viewed the NGI as important in deciding whether to purchase "Yes" or "No" shares in the January Contract.

66.     As a member of the U.S. Army's Special Forces with access to nonpublic classified or sensitive information, including with respect to Operation Absolute Resolve, Van Dyke owed a duty of trust and confidentiality to the U.S. Government—including the Department of War and

15

the U.S. Army—and its citizens to keep the NGI confidential, and not misappropriate it for his own personal benefit.

67.     Van Dyke misappropriated the material NGI by knowingly or recklessly using it to trade the January Contract in breach of his duties of trust and confidentiality.

68.     Van Dyke engaged in this scheme for the sole purpose of obtaining profits for his own personal gain.  As set forth above, as a direct result of his trading in the January Contract using material NGI, Van Dyke obtained more than approximately $404,000 in profits.

69.     Each fraudulent or deceptive act, including each trade Van Dyke placed in the January Contract using misappropriated material NGI, is alleged as a separate and distinct violation of Section 6(c)(1) of the Act and Regulation 180.1(a)(1), (3).

70.     Van Dyke engaged in the acts and practices described above willfully, knowingly or with reckless disregard.

## COUNT TWO

### Violations of Section 4c(a)(3) of the Act, 7 U.S.C. § 6c(a)(3)

71.     The allegations in the preceding paragraphs are realleged and incorporated herein by reference.

72.     The January Contract is a swap as defined by Section 1a(47) of the Act, 7 U.S.C. § 1a(47).

73.     Section 4c(a)(3) of the Act, 7 U.S.C. § 6c(a)(3) provides:

"It shall be unlawful for any employee or agent of any department or agency of the Federal Government . . . who, by virtue of the employment or position of the . . . employee or agent, acquires information that may affect or tend to affect the price of . . . any swap, and which information has not been disseminated by the department or agency of the Federal Government holding or creating the information or by Congress or by the judiciary in a manner which makes it generally available to the trading public, or disclosed in a criminal, civil, or administrative hearing, or in a congressional, administrative, or Government

16

Accountability Office report, hearing, audit, or investigation, to use the information in his personal capacity and for personal gain to enter into, or offer to enter into . . . a swap."

74.     During the Relevant Period, Van Dyke was an employee or agent of a department or agency of the Federal Government.

75.     By virtue of his employment or position in the U.S. Army's Special Forces, Van Dyke acquired NGI which had not been disseminated by any department or agency of the Federal Government in a manner that made it generally available to the trading public, and had not otherwise been disclosed in a manner contemplated by Section 4c(a)(3).

76.     The NGI was information that would affect or tend to affect the price of the January Contract, and thus material to the contract.

77.     Van Dyke used the NGI in his personal capacity and for personal gain to enter into the January Contract.  As set forth above, as a direct result of his trading in the January Contract using misappropriated NGI, Van Dyke obtained more than approximately $404,000 in profits.

78.     By reason of the foregoing, Van Dyke violated Section 4c(a)(3) of the Act.

79.     Each act, including each trade Van Dyke placed in the January Contract using the NGI, constitutes a separate and distinct violation of Section 4c(a)(3) of the Act.

## COUNT THREE

### Violations of Section 4c(a)(4)(C) of the Act, 7 U.S.C. § 6c(a)(4)(C)

80.     The allegations in the preceding paragraphs are realleged and incorporated herein by reference.

81.     The January Contract is a swap as defined by Section 1a(47) of the Act, 7 U.S.C. § 1a(47).

82.     Section 4c(a)(4)(C) of the Act, 7 U.S.C. § 6c(a)(4)(C), makes it unlawful for any person to:

17

steal, convert, or misappropriate, by any means whatsoever, information held or created by any department or agency of the Federal Government . . . that may affect or tend to affect the price of . . . any swap, where such person knows, or acts in reckless disregard of the fact, that such information has not been disseminated by the department or agency of the Federal Government holding or creating the information or by Congress or by the judiciary in a manner which makes it generally available to the trading public, or disclosed in a criminal, civil, or administrative hearing, or in a congressional, administrative, or Government Accountability Office report, hearing, audit, or investigation, and to use such information . . . to enter into, or offer to enter into . . . a swap.

83.     As a member of the U.S. Army's Special Forces with access to nonpublic classified or sensitive information, including with respect to Operation Absolute Resolve, Van Dyke owed a duty of trust and confidentiality to the U.S. Government—including the Department of War and the U.S. Army—and its citizens to keep the NGI confidential and not misappropriate it for his own personal benefit.

84.     Van Dyke knew that the NGI had not been disseminated by any department or agency of the Federal Government in a manner that made it generally available to the trading public, and had not otherwise been disclosed in a manner contemplated by Section 4c(a)(4)(C).

85.     The NGI was information that would affect or tend to affect the price of the January Contract, and thus material to the contract.

86.     Van Dyke used the NGI to enter into the January Contract.

87.     By trading on the NGI in breach of his duties of trust and confidentiality, Van Dyke stole, converted, and/or misappropriated the NGI.

88.     By reason of the foregoing, Van Dyke violated Section 4c(a)(4)(C) of the Act.

89.     Each act, including each trade Van Dyke placed in the January Contract using the NGI, constitutes a separate and distinct violation of Section 4c(a)(4)(C) of the Act.

18

## VIII.   RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that this Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1, and pursuant to its own equitable powers:

A. Enter an order finding that Van Dyke violated Sections 4c(a)(3), 4c(a)(4)(C), and 6(c)(1) of the Act, 7 U.S.C. §§ 6c(a)(3), 6c(a)(4)(C), 9(1), and Regulation 180.1(a)(1), (3), 17 C.F.R. § 180.1(a)(1), (3) (2025);

B. Enter an order of permanent injunction enjoining Van Dyke, and his affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with him, who receive actual notice of such order by personal service or otherwise, from engaging, directly or indirectly, in conduct in violation of Sections 4c(a)(3), 4c(a)(4)(C), and 6(c)(1) of the Act and Regulation 180.1(a)(1), (3);

C. Enter an order of permanent injunction enjoining Van Dyke, and his affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with him, from directly or indirectly:

1) Trading on or subject to the rules of any registered entity (as that term is defined by Section 1a(40) of the Act, 7 U.S.C. § 1a(40));

2) Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2025)), for accounts held in the name of Van Dyke or for any account in which Van Dyke has a direct or indirect interest;

3) Having any commodity interests traded on Van Dyke's behalf;

4) Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

19

5) Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;

6) Applying for registration or claiming exemption from registration with the CFTC in any capacity, and engaging in any activity requiring such registration or exemption from registration with the CFTC except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2025); and

7) Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2025)), agent, or any other officer or employee of any person registered, exempted from registration, or required to be registered with the CFTC except as provided for in Regulation 4.14(a)(9);

D. Enter an order requiring Van Dyke, as well as any third-party transferee and/or successors thereof, to disgorge, pursuant to such procedure as the Court may order, all benefits received including, but not limited to, salaries, commissions, loans, fees, revenues, and trading profits derived, directly or indirectly, from acts or practices which constitute violations of the Act and Regulations as described herein, including pre-judgment and post-judgment interest;

E. Enter an order requiring Van Dyke, as well as his successors, to make full restitution, pursuant to such procedure as the Court may order, to every person who has sustained losses proximately caused by the violations described herein, including pre-judgment interest and post-judgment interest;

F. Enter an order directing Van Dyke to pay a civil monetary penalty, to be assessed by the Court, in an amount not to exceed the penalty prescribed by Section 6c(d)(1) of the Act, 7 U.S.C. § 13a-1(d)(1), as adjusted for inflation pursuant to the Federal Civil

Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114-74, 129 Stat. 584 (2015), title VII, Section 701, *see* Regulation 143.8, 17 C.F.R. § 143.8 (2025), for each violation of the Act and Regulations, as described herein, plus post-judgment interest;

G.  Enter an order requiring Van Dyke to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2413(a)(2); and

H.  Enter an order providing such other and further relief as this Court may deem necessary and appropriate under the circumstances.

## IX.  DEMAND FOR JURY TRIAL

Plaintiff CFTC hereby demands a jury trial.

Dated:  April 23, 2026

**COMMODITY FUTURES TRADING COMMISSION**

Brian A. Hunt, Senior Trial Attorney
Julia C. Colarusso, Associate Director
(*pro hac vice forthcoming*)
John Dunfee, Assistant Chief, Complex
Fraud Task Force (*pro hac vice forthcoming*)
Paul G. Hayeck, Deputy Director
(*pro hac vice forthcoming*)
COMMODITY FUTURES TRADING COMMISSION
Three Lafayette Centre
1155 21st St. NW
Washington, DC 20581
Phone:  (202) 418-5000
bhunt@cftc.gov
jcolarusso@cftc.gov
jdunfee@cftc.gov
phayeck@cftc.gov

Alyson Cohen, Trial Attorney
COMMODITY FUTURES TRADING COMMISSION
Ted Weiss Federal Office Building
290 Broadway, Suite 600
New York, NY 10007
Phone: (646) 746-9700
acohen@cftc.gov

ATTORNEYS FOR PLAINTIFF
COMMODITY FUTURES TRADING
COMMISSION